Michael Paul Bowen
KASOWITZ BENSON TORRES LLP
1633 Broadway
New York, New York 10019
(212) 506-1700
(212) 506-1800 (Fax)

Constantine Z. Pamphilis
*Pro Hac Vice to Be Submitted*
KASOWITZ BENSON TORRES LLP
1415 Louisiana Street, Suite 2100
Houston, Texas 77002
(713) 220-8800
(713) 222-0843 (Fax)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STABILIS FUND II, LLC,<br><br>                    Plaintiff,<br><br>        - against -<br><br>COMPASS BANK,<br><br>                    Defendant. | 17 cv 8025 (GBD)<br><br>(NY Sup. Ind. No. 655975/2017)<br><br>**COMPLAINT** |

Plaintiff Stabilis Fund II, LLC ("Stabilis"), as and for its complaint against defendant Compass Bank, d/b/a BBVA Compass ("Compass Bank" or "Bank"), alleges on knowledge with respect to itself and upon information and belief as to all other matters as follows:

<u>**NATURE OF THE CASE**</u>

1.      This is an action to recover damages caused by and to redress Compass Bank's fraud in selling a commercial loan to Stabilis while concealing material facts about that loan (referred to herein as the "Kaura Loan," as defined below).

2.      In March 2013, Stabilis purchased the Kaura Loan from Compass Bank.  The Kaura Loan is a commercial $4 million loan collateralized by valuable income-generating real

estate in California.  At the time of the sale to Stabilis, Compass Bank described the loan as in

default, with principal outstanding in excess of $3.8 million.  Based on its due diligence, the

material representations by the Bank, and Stabilis' reasonable expectation that the Bank was not

concealing material information related to the Kaura Loan, Stabilis purchased the defaulted

Kaura Loan to collect on the loan from Borrowers (defined below) or through foreclosure of the

pledged collateral.  But the Bank failed to disclose that it had entered into and executed a written

loan modification with Borrowers – which document materially undermined the value of the loan

that the Bank had sold to Stabilis.

3.     Even after the sale transaction closed, the Bank tried to cover up the "missing"

loan modification.  First, it falsely claimed that no such document ever existed.  It did exist.

Then the Bank falsely stated that the Bank had discussed a modification but that no such

document had been drafted or agreed to.  In truth, it was in writing.  Thereafter, the Bank

acknowledged that some terms had been agreed to and a draft of the agreement had been

prepared but assured Stabilis it had never been executed.  In fact, it was signed.  Then the Bank

finally admitted that an agreement had been drafted and executed but that it did not have the

document.  That too was not true as it had the original, executed document in its or its counsel's

possession all along.

4.     The true facts were revealed in the fall of 2014 – over a year after Stabilis

purchased the loan – and only because Borrowers sued the Bank for fraud in California and

forced the Bank to produce the written, executed loan modification through discovery in that

litigation.  Even during that proceeding, the Bank insisted to Stabilis that its falsehoods were true

– and only admitted the truth, and the fact that it had been lying to Stabilis all along, when it was

left no other choice than to produce the loan modification documents in discovery.

5.       Due to the Bank's fraud, the Kaura Loan was worth significantly less than what Stabilis had paid for it.  In fact, had the Bank told Stabilis the truth about the loan modification from the beginning, Stabilis would not have purchased the Kaura Loan.

6.       Additionally, had the Bank not repeatedly lied about the modification after the loan sale closed, Stabilis would have had the correct facts and therefore the opportunity to evaluate the dispute with Borrowers properly and to negotiate an appropriate resolution with them prior to trial.

7.       Stabilis, a New York-based financial firm, has considerable experience in managing, restructuring, servicing and collecting commercial loans similar to the Kaura Loan. The terms of its purchase of the Kaura Loan were negotiated with the Bank based on Stabilis' due diligence and review of the loan documents provided by the Bank, which did not include the loan modification concealed by the Bank.  The existence of the written, executed loan modification changed the risk factors of the loan.  Had the existence of the written, executed loan modification not been concealed by the Bank, Stabilis would not have agreed to purchase the Kaura Loan.  The Bank's initial fraud and subsequent false denials and cover-up devalued the Kaura Loan and directly led to the erosion of the value of the loan collateral.

8.       Because of the Bank's malfeasance, instead of collecting on the Kaura Loan, Stabilis was embroiled in litigation in California, where Borrowers, aided by the "missing" loan modification and the Bank's false statements, successfully survived summary judgment, necessitating a full seven-week jury trial.  That extended litigation and trial cost Stabilis millions in unforeseen litigation costs to determine what, if any, rights Borrowers had under the loan documents and written loan modification and then to enforce the Kaura Loan.  That litigation is still on-going and costs continue to accrue.

9.      In the meantime, during the lengthy delays in that litigation, the real estate which served as collateral for the Kaura Loan was placed into receivership.  The court-appointed receivers made expenditures to repair the building using priority financing, rendering it entirely worthless as collateral for the Kaura Loan.

10.     Stabilis now brings this action seeking in excess of $8 million in compensatory damages and punitive damages to be established at trial.

## PARTIES

11.     Plaintiff Stabilis is a Delaware limited liability company with its principal place of business in New York, New York.  None of its members is a citizen of, or domiciled in, Alabama.

12.     Defendant Compass Bank is a commercial bank doing business under the brand name BBVA Compass.  Its principal place of business is Birmingham, Alabama.  It is wholly owned by BBVA Compass Bancshares, Inc., also based in Alabama.

## FACTS

**A.    The Kaura Loan and Compass Bank**

13.     The Kaura Loan was first issued in 2007.  Under the terms of that loan, the borrowers, Vinod Kumar Kaura and Veena Rani Kaura, as Trustees of the Kaura Family Living Trust dated June 12, 1999 (the "Kauras" or "Borrowers"), borrowed $4,050,000, using a commercial property known as Vintage Palms Apartments in Indio, California (the "Vintage Palms") as collateral.  That property is a 75-unit multi-family rental apartment building.  Pursuant to a Deed of Trust, the Kauras owned that building and the purpose of the loan was to enhance the operation and management of that property.

14.     The original Kaura Loan was made by Zions First National Bank ("Zions") on December 28, 2007.  It was memorialized in various documents, including a promissory note

dated December 28, 2007, and an assignment of leases and rents from the Vintage Palms to the lender.

15.     Six months later, on or about July 7, 2008, the loan was assigned by Zions to BBVA Bancomer USA, the predecessor entity to Compass Bank.  By 2011, Compass Bank was the lender on the loan as the successor in interest to BBVA Bancomer USA.

16.     Compass Bank (aka BBVA Compass) is one of the nation's 50 largest banks, and was previously a member of the S&P 500 Index and the Dow Jones Select Dividend Index.  It has branch locations throughout the United States, including New York.

**B.     Borrowers' Default and Related Tenant Lawsuits**

17.     In June 2009, the Kauras executed documents purporting to transfer their interest in the Vintage Palms to an entity they controlled, known as Valley & Mountain, LLC.  That purported transfer, which was originally done without notice to or the approval of the lender, was in violation of the terms of the Kaura Loan.

18.     Thereafter, the Kauras defaulted on the Loan by failing to make payments due on July 1, 2011, August 1, 2011, and September 1, 2011, failing to furnish Compass Bank with the rent rolls for the Vintage Palms as of December 31, 2010, and failing to pay taxes and insurance on the property.

19.     Around the same time, tenants in the Vintage Palms sued the Kauras and Valley & Mountain, as the new purported owner of the Vintage Palms.  In September 2011, forty-seven tenants filed suit alleging numerous instances of neglect and failure to repair hazardous substandard living conditions, including inadequate sanitation, structural problems, and other nuisances.

20.     In December 2011, the City of Indio followed suit, suing both the Kauras and Valley & Mountain LLC for city code violations and hazardous conditions at the property,

including, for example, broken, missing, or boarded up windows; deteriorated external facades; water damage; and water heaters lacking proper seismic strapping.

21.     During the pendency of these lawsuits in 2012 and early 2013, Borrowers negotiated with Compass Bank to modify the terms of the Kaura Loan.  As is typical in commercial loan transactions, the Bank discussed a potential modification with Borrowers. What is not typical is that, as the Bank was eventually compelled to disclose, the talks resulted in the execution of a negotiated written loan modification that the Bank then withheld and concealed, even as the Bank continued discussions with Borrowers for a lengthy period during the 18-months preceding the sale to Stabilis.

22.     For reasons that have never been explained by the Bank, the Bank – after negotiating and executing the loan modification with Borrowers, and after requiring Borrowers to make a tax payment (which Borrowers made) – decided to sell the Kaura Loan with no notice to Borrowers.  Notably, however, as Stabilis later learned, the Bank ratified and consented after-the-fact to Borrowers' assignment of the loan to Valley & Mountain LLC, and provided Borrowers an opportunity to cure the defaults for a period of weeks that extended past the date that the loan was sold to Stabilis.  Just as it concealed the loan modification, the fact that the Bank had taken steps that would affect the terms of the Kaura Loan, even though it knew it would no longer own that loan, was likewise not disclosed to Stabilis.

23.     Once the Bank decided to sell the Kaura Loan, the Bank and its officers sought a quick transaction.  It offered what the market, including Stabilis, was induced to believe were relatively attractive terms.

24.     But in making that sale to Stabilis the Bank and its officers did more than just sell the loan.  They committed fraud to get Borrowers and the Vintage Palms off its books.

C.   <u>The Loan Sale Agreement and Compass Bank's Fraud</u>

25.   Stabilis and its affiliated private investment firm specialize in, among other investment vehicles, secondary market commercial loan transactions.  It has experience in transacting, managing, servicing, restructuring, facilitating financing for distressed borrowers, and, when necessary, enforcing creditor's rights in commercial loans, including defaulted loans of various sizes and complexity.  Using that expertise and experience with similar commercial loans, Stabilis developed market strategies to obtain and profit from debt instruments and other securities that fit its parameters and valuations, augmenting liquidity in the financial markets, which ultimately benefits all market participants, including small business owners.  It has completed hundreds of transactions with various sellers, including regional, community, and money-center banks, commercial mortgage-backed securities lenders and special servicers, as well as direct lending to borrowers.

26.   By early 2013, Stabilis and the Bank had a letter of agreement in place for the loan sale transaction.  Stabilis conducted thorough due diligence, including reviewing all loan documents provided by the Bank, as well as a general review of the exterior of the property as allowed by the Bank's terms of the sale of the loan.

27.   Stabilis' due diligence was necessarily based on fundamental representations made by the Bank, including its (false) claim that it had provided all loan documents to Stabilis. During negotiations leading up to, and at the time of, the transaction, Compass Bank had identified, both in writing and orally, the loan documents as the documents that were eventually itemized on a schedule to the parties' final agreement.  That schedule included, for example, the original 2007 loan, the related business loan agreement and promissory note, the Deed of Trust pertaining to the Vintage Palms, and assignment of rents, as well as related guarantees by the

Kauras, as principals.  The concealed loan modification was not included on any list of loan documents the Bank provided to Stabilis.

28.     During the parties' negotiations and Stabilis' due diligence, a Compass Bank officer, Leif Jensen, responded to Stabilis' inquiries concerning the loan documents identified by the Bank.  At all relevant times, Jensen was a Senior Vice President of Compass Bank.  He oversaw the sale of the Kaura Loan to Stabilis and he is the signatory for the Bank on the Loan Sale Agreement (defined below).  At no time before the sale closed did Jensen disclose to Stabilis the existence of the concealed loan modification documents.

29.     Further, both in writing and otherwise, the Bank represented that it disclosed to Stabilis all of the "Loan Documents," as that term is defined in the Loan Sale Agreement.  In the Loan Sale Agreement, the Bank expressly defined Loan Documents to include all documents reflecting the lender's "right, title and interests" to the loan, including all rights and terms governing the lender's rights "to principal, unpaid interest and fees now or hereafter due thereunder."

30.     Based on its review of the Loan Documents and other information provided by the Bank, Stabilis concluded that it had a good faith reasonable basis to believe, as the Bank implicitly and explicitly represented during negotiations, no loan modification existed.

31.     Moreover, it is the common, customary and usual practice in this industry that the seller of a loan, like Compass Bank, would disclose and is obligated to disclose, to a buyer, like Stabilis, all loan documents, including any instrument or other document signed by all parties, including the lender, that purports to create, alter or affect the rights or obligations of the lender or borrower or any other term of the loan or its enforceability.  Stabilis has participated in hundreds of such loan sale transactions and has never before encountered a situation, like this

8

one, where the seller/lender failed to disclose a fully executed document that pertained to and modified or potentially modified, the terms of the loan being sold to a buyer.

32.    Given this industry custom and practice, any bank or other seller of a loan that failed to disclose a written and signed loan modification document – as Compass Bank failed to do in its transaction with Stabilis – is charged with knowing that, by doing so, it was intentionally misleading, if not outright defrauding, the buyer of the loan.

33.    Only one document in the list of Loan Documents appended to the parties' Loan Sale Agreement mentioned any potential loan modification, a letter by the Bank's legal counsel dated February 4, 2013, and addressed to Borrowers.  That letter informed Borrowers that they had failed to provide documentation that Veena Kauras had authority on behalf of Valley & Mountain LLC to sign a proposed modification, dated December 16, 2011, declaring it void.

34.    That February 2013 letter nowhere indicated that a loan modification agreement had been fully negotiated, finalized and signed by the parties.  In fact, the letter itself omitted from its own introductory itemization of "loan documents" any mention that the parties had actually agreed on terms and reduced the December 16, 2011 modification to a final writing that had been executed by the parties.

35.    As a matter of industry custom and practice, this letter and its contents are not atypical in the commercial loan context.  It is common in the banking and finance industry for a lender to discuss a possible loan modification for a borrower in default, and then to terminate such discussions with a letter like this one, when no agreement had ever been reached.  Given the context of Stabilis' extensive communications with Compass Bank about the Kaura Loan, nothing in this letter put Stabilis on notice that the Bank and Borrowers had negotiated for over a

year and that a written loan modification had actually been entered into by them during that period.

36.     The fact is:  At no time before the close of the transaction did Compass Bank disclose to Stabilis in any way that the December 2011 loan modification had been negotiated, reduced to writing, finalized and executed by both parties.  One of the Bank's officers, Jon Larson, a Senior Vice President of the Bank at the relevant time, has attested under oath that, at no time before the closing, did the Bank disclose the December 2011 loan modification to Stabilis.

37.     Based on that material omission by the Bank, in March 2013, Compass Bank and Stabilis entered into the loan sale agreement dated March 14, 2013 (the "Loan Sale Agreement") pursuant to which Stabilis paid Compass Bank to buy the Kaura Loan – namely, the collateralized $4,050,000 loan to the Kauras, secured by the Vintage Palms, with a then-outstanding principal balance of $3,850,548.90.

38.     Among other material terms, the Loan Sale Agreement contains an indemnification provision that under certain conditions, requires Stabilis to indemnify the Bank in litigation with Borrowers.  Specifically, under the agreement, that indemnification obligation is triggered where the action involves a claim related to the "Loan Rights," as that term is defined in the Loan Sale Agreement.  The term Loan Rights is expressly defined as those rights set forth in the Loan Documents itemized in that agreement.

**D.     Stabilis' Discovery of the Fraud**

39.     Less than a month after the closing on the Loan Sale Agreement, Borrowers and Valley & Mountain filed suit in April of 2013 against Compass Bank for breach of the December 2011 loan modification (referred to herein as the "concealed loan modification"), fraud, negligent misrepresentation, and declaratory relief (the "California Action").

40.     In the California Action, Borrowers alleged that the concealed loan modification had been finalized and executed by both Borrowers and the Bank.  They contended that, based on the signed modification and the fact that they were awaiting further direction from the Bank after the modification agreement was executed, they were not in material default under the terms of the Kaura Loan, as modified.  They further alleged that, in partial performance of the concealed loan modification, Borrowers paid tens of thousands of dollars in property taxes owed on Vintage Palms, as directed by the Bank – which the Bank also concealed from Stabilis.  They alleged that Compass Bank's claims that Borrowers were in default of that loan were false and that the Bank had improperly lulled Borrowers to rely on the signed loan modification when the Bank had intended all along to sell the loan to a new lender who would seek foreclosure.

41.     Under the terms of the Loan Sale Agreement, Compass Bank sought indemnity from Stabilis, which hired counsel and oversaw the Bank's defense of the California Action under an express reservation of rights.  In doing so, Stabilis, for the first time – many months after the Bank sold the loan – learned of Borrowers' claim that the Bank had entered into a final, executed loan modification of the Kaura Loan and their grave allegations that the Bank had committed fraud.

42.     In overseeing the legal defense, Stabilis demanded information from the Bank related to Borrowers' claim concerning the concealed loan modification.  At multiple times between May 2013 and September 2013, Stabilis personnel and agents discussed this issue with Bank officers, including especially William (Fritz) Pahland, an outside lawyer for the Bank, and Casey Moore, the Bank's internal legal counsel.

43.     During that period, Pahland and Moore, among others, expressly represented to Stabilis, on multiple occasions, that no loan modification existed (let alone drafted and

executed).  In statements to Stabilis in July 2013, Pahland, in particular, made the false claim that Borrowers' contentions outlined above had no "factual merit."  As discovery progressed, Pahland, among others at the Bank, falsely stated to Stabilis that the terms of a December 2011 modification were discussed but never drafted.

44.     During discovery and based on information Borrowers provided to Stabilis in that litigation, Stabilis pursued the matter further with the Bank.  In or about August 2013, the Bank, through Pahland, changed its story and admitted – for the first time – that the December 2011 loan modification had been drafted, but falsely denied that it had ever been signed, and further falsely stated that the Bank did not possess any copy of the written modification.

45.     None of these statements to Stabilis made on behalf of and authorized by Compass Bank was true.  In fact, by falsely denying the truth about the concealed loan modification, the Bank continued to cover up its fraudulent inducement and exacerbated the damages to Stabilis in an unlawful effort to conceal its own wrongdoing and malfeasance.

46.     Among other things, the false and misleading concealment of the truth about the concealed loan modification foiled efforts to resolve the California Action before trial.  By lying to Stabilis, the Bank materially impeded Stabilis' ability to assess the merits of the California Action.  For instance, during talks between Stabilis and the Kauras in late 2013, the Kauras offered to settle the action by paying Stabilis $3.4 million.  Stabilis, having been intentionally misled by the Bank, rejected that offer as it was well below what was believed to have been owed on the loan at that time.

47.     Throughout the litigation of the California Action, Stabilis continued to be misled by the Bank's ongoing cover up and fraud despite Stabilis' efforts to get to the bottom of the matter.

48.     To protect its rights, and its rights to the Vintage Palms as collateral, Stabilis commenced a separate foreclosure action in June 2013 against Borrowers and sought the judicial appointment of a receiver to collect rents and remediate any defective or unsafe conditions at the property.

49.     A receiver was eventually appointed in August of that year.

50.     In response to the foreclosure action, however, the Kauras sought bankruptcy protection in 2013, filing a series of bankruptcy petitions, which, by virtue of the automatic bankruptcy stay, stayed the state court actions for significant periods.

51.     During that delay created by the Kauras and their multiple bankruptcy filings, the court-appointed receiver was prevented from taking control of the Vintage Palms and the Kauras remained in possession and control.  During this time, the property conditions continued to deteriorate.

52.     When the second bankruptcy was finally dismissed, the court-appointed receivers demanded funding for repairs and remediation of the property.  That funding was secured by "priming" receivership certificates that had priority of repayment over the security interest of the Kaura Loan.  Stabilis' formerly first-lien deed of trust was thus made subordinate to the priming receivership certificates.

53.     In 2015, just a few months after the rent-receiver was appointed, the City of Indio intervened, without objection from Stabilis, in the foreclosure action to install a health and safety receiver in order expand the authority of the receiver to repair the damages and neglect caused by the Kauras to the Vintage Palms.  That, too, required additional funding for the receiver secured by receivership certificates.  The funding of the super-priority receivership certificates – which

exceeded $4,000,000 – and the hundreds of thousands of dollars in property taxes that the Kauras refused to pay fully eroded equity in the property, leaving no equity to secure Stabilis' loan.

54.     Following dismissal of the Kauras' two bankruptcy filings, the parties in the California Action commenced discovery.  In discovery, the Kauras demanded that Compass Bank produce the concealed loan modification documents and other evidence related to that modification agreement.  In response to these discovery demands and a subpoena served on the Bank's outside counsel, in September 2014, the Bank finally produced the concealed loan modification documents, including a fully executed Loan Modification Agreement, dated December 16, 2011.  This modification agreement was executed by all parties, including the Bank.

55.     This was the first time that the Bank conceded the truth:  that, contrary to its repeated false representations to Stabilis both before and after the sale of the Kaura Loan, the loan modification was finalized in writing, was signed by the parties, including the Bank, and had been, in fact, in the possession of the Bank and/or its counsel the whole time.

**E.   Stabilis' Damages**

56.     Had Compass Bank disclosed the existence of the concealed loan modification agreement during Stabilis' due diligence, Stabilis would not have agreed to the Loan Sale Agreement in the first place.  By intentionally omitting the concealed loan modification from the list of Loan Documents, the Bank falsely represented that it had provided to Stabilis all Loan Documents.  The existence of a fully executed written document that, on its own plain terms, purported to alter Borrowers' rights and liabilities fundamentally changed the borrower-secured lender relationship and purported to materially change the terms of the Kaura Loan.  Had that

been known to Stabilis at the time, that information would have materially altered Stabilis' calculation of the value of the Kaura Loan such that Stabilis would not have agreed to buy it.

57.     Thus, as a direct result of Compass Bank's flagrant fraudulent inducement, Stabilis was unlawfully induced to pay Compass Bank the purchase price for the Kaura Loan.

58.     In committing this fraud, the Bank also improperly invoked and benefited from the indemnification provision in the Loan Sale Agreement.  The Bank deceived Stabilis into defending against Borrowers' fraud claims against the Bank – which were also premised on the very same concealed loan modification documents that the Bank had failed to disclose to and intentionally concealed from Stabilis – when the Bank knew that Borrowers' claims about the existence of those documents were true.  In that way, the Bank deceived Stabilis into paying (under an express reservation of rights) millions in legal fees to defend Compass Bank in the California Action against Borrowers' allegations based on the Bank's actions and inactions.

59.     By continuing its fraudulent cover up, Compass Bank prevented Stabilis from accurately assessing Borrowers' claims against the Bank.  That directly resulted in Stabilis being lured unwittingly into a lengthy and expensive litigation and trial that would have been avoided had Compass Bank simply told the truth.

60.     Moreover, had the Bank not prevented Stabilis from resolving the litigation expeditiously, Stabilis would have been able to avoid the appointment of the receiver and the financing that eroded any equity in the Vintage Palms during the protracted litigation.

61.     As a direct consequence of the Bank's fraud, Stabilis incurred significant monetary damages, including legal fees and costs, in an amount to be established at trial but not less than $8 million.

## FIRST CAUSE OF ACTION

### Fraudulent Inducement

62.     Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

63.     As described above, defendant intentionally concealed material facts and information from plaintiff, which defendant had a legal duty to disclose.  In doing so, defendant made various material statements of present facts and material omissions to plaintiff knowing such statements were untrue and that the omissions conveyed a false impression and were materially misleading.

64.     Defendant fraudulently concealed, misrepresented, and intentionally omitted the existence of the concealed loan modification, the fact that it was finalized in writing in December 2011 and executed by the parties, including defendant, and that defendant possessed those documents.

65.     During due diligence, and based on industry custom and practice, defendant represented to plaintiff both through its statements and actions that it had disclosed all loan documents related to the Kaura Loan, and terms thereof, and that no loan modification was ever written or otherwise existed.  Defendant was under a legal duty, which it failed to discharge, to disclose the existence of the concealed loan modification and the documents related to that written and executed modification, and to do so before plaintiff entered the Loan Sale Agreement.

66.     Defendant knew or had the means of knowing that the existence of the concealed loan modification was material in that it would have altered plaintiff's decision to agree to the

Loan Sale Agreement such that the transaction without disclosure was rendered inherently unfair.

67.     Defendant's intentional concealment of these material facts, false statements and omissions was done willfully and wantonly with the intent to induce plaintiff into agreeing to the Loan Sale Agreement.

68.     Plaintiff reasonably and foreseeably relied on the false statements and omissions made by defendant.

69.     Defendant had peculiar, non-public knowledge of critical, material information in its possession to which plaintiff had no access or notice and which demonstrated that these concealed facts, misrepresentations, and omissions were false and misleading.

70.     Plaintiff had no knowledge that these concealed facts, misrepresentations, and omissions were false and could not have determined the falsity of the representations or discovered the omissions and therefore reasonably and justifiably relied on them.

71.     If not for defendant's concealment of the concealed loan modification and related executed documents prior to the Loan Sale Agreement, plaintiff would not have agreed to purchase the Kaura Loan, and therefore was fraudulently induced into entering that agreement, which caused plaintiff to incur significant monetary damages.

72.     Additional evidence of defendant's fraudulent inducement may be within its exclusive possession and control.

73.     As a direct and proximate result of defendant's fraudulent conduct, plaintiff suffered significant damages in an amount to be determined at trial.

## SECOND CAUSE OF ACTION

### Fraud and Fraudulent Concealment

74.     Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

75.     Defendant made statements after the Loan Sale Agreement was executed, in which defendant falsely denied the existence of the concealed loan modification documents, falsely denied that they were executed and falsely denied that defendant had possession of such documents.  At the time defendant made these false statements, defendant knew they were materially false or omitted facts that rendered the statements materially false and misleading.

76.     Defendant made these post-agreement false statements with the intention to induce plaintiff to rely on the falsehoods, and plaintiff reasonably and foreseeably so relied.

77.     Defendant had peculiar, non-public knowledge of critical, material information in its possession to which plaintiff had no access or notice and which demonstrated that these concealed facts, misrepresentations, and omissions were false and misleading.

78.     Plaintiff had no knowledge that these concealed facts, misrepresentations, and omissions were false and could not have determined the falsity of the representations or discovered the omissions and therefore reasonably and justifiably relied on them.

79.     If not for defendant's post-sale material misrepresentations and omissions, plaintiff would not have incurred the additional legal expenses of protracted litigation in the California Action, but would have settled that action before trial.  But for defendant's false statements and omissions, plaintiff would not have incurred millions of dollars in legal expenses litigating issues in the California Action that should and would have been avoided had defendant disclosed the truth to plaintiff.   Likewise, but for defendant's false statements and omissions, the

equity in the collateral property would not have been eroded through "priming" receivership certificates which devalued the Kaura Loan.

80.    Additional evidence of defendant's fraud may be within its exclusive possession and control.

81.    As a direct and proximate result of defendant's fraudulent conduct, plaintiff suffered significant damages in an amount to be determined at trial.

## **DEMAND FOR JURY**

82.    Plaintiff hereby demands a trial by jury of all issues so triable.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiff seeks judgment against defendant as follows:

A.    For compensatory damages in an amount to be determined at trial;

B.    For punitive damages in an amount to be determined at trial;

C.    For costs and expenses of this action, including reasonable attorneys' fees;

D.      For interest at the maximum rate provided by law; and

E.      For such other and further relief as this Court deems just and proper.


Dated:  New York, New York
        November 30, 2017


                        KASOWITZ BENSON TORRES LLP

                By:      /s/ *Michael Paul Bowen*
                        Michael Paul Bowen (mbowen@kasowitz.com)
                        1633 Broadway
                        New York, New York 10019
                        (212) 506-1700

                        Constantine Z. Pamphilis (dpamphilis@kasowitz.com)
                        (*pro hac vice* to be submitted)
                        1415 Louisiana Street, Suite 2100
                        Houston, Texas 77002
                        (713) 220-8800

                        *Attorneys for Plaintiff Stabilis Fund II, LLC*

20